**John A. NAPLES, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18186.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 6, 1964.

Decided Nov. 9, 1964.

Mr. Alexander B. Hawes (appointed by this court), Washington, D. C., with whom Miss Elise B. Heinz, Washington, D. C., was on the brief, for appellant.

Mr. Anthony A. Lapham, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Mr. Frederick G. Smithson, Asst. U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and BASTIAN and WRIGHT, Circuit Judges.

BAZELON, Chief Judge.

In Naples v. United States, 113 U.S. App.D.C. 281, 307 F.2d 618 (1962) (*en banc*), we reversed appellant's conviction of murder in the first degree, murder in the second degree, housebreaking and petty larceny. Upon retrial he was convicted of murder in the first degree, murder in the second degree, and housebreaking,[1] and the jury unanimously recommended life imprisonment. He again seeks reversal.

### I.

We consider first the admissibility of confessions which, according to two police officers, were made by appellant in the following circumstances. Immediately after his arrest, appellant was brought

---

1. The petty larceny charge was dismissed by the trial court for insufficiency of evidence.

to the Ninth Precinct Police Station and taken to the second floor office of Lieutenant Culpepper, who testified:

"I told the defendant that I was a police officer, and that he did not have to talk to me unless he wanted to.

"He replied, 'I know that.'

"I asked him if he had done something that he knew to be wrong, and if he wanted to tell me about it.

"And he said, 'About what?'

"And I said, 'Have you done something that is wrong and that you are ashamed of and want to tell the truth about?'

"And he said, 'Do you mean about the lady?'

"And I said, 'Yes.'

"He said, 'Well, I was prowling in the hallway,' and I interrupted and said, 'What hallway?'

"He said, 'The hallway in the apartment next to where I live.'

"And I said, 'Where do you live?'

"He replied, 'The 200 block of Massachusetts Avenue, Northeast.'

"I asked him to continue. He then said that he was prowling in the hallway, looking for something to steal; that he was standing in front of the mail boxes, when he noticed that the last apartment on that floor, the first floor, was ajar; the door was not closed.

"He walked over to the door and stood there for some time, and became aware that no one was in the apartment. He said he knew no one was in the apartment because they would have heard him, had there been someone there. He went into the apartment, looked through the apartment and searched it. He found, took two dollars from a drawer in a small table.

"He was looking into a closet, when a white lady came in. She stood at the door and shouted and said, 'What are you doing here,' and threw her pocketbook at him, and at the same time said, 'Get out of here.'

"He related then that *everything went dark, and then the next thing he realized* was that he was leaning over the lady. She was on the floor. He saw lots of blood and he had blood on his hands, and he knew that he had hurt her." [Emphasis supplied.]

On the former appeal, we held the substance of this testimony was not excluded by Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Naples v. United States, 113 U.S.App. D.C. 281, 307 F.2d 618 (1962).[2] Without considering the merits of this holding, we apply it as the law of the case to sustain admission of this testimony.

At the second trial there was testimony of further admissions not offered at the first trial. After appellant had finished his statement to Culpepper, he was taken from Culpepper's second-floor office to a room on the first floor for booking, and returned to Culpepper's office ten to fifteen minutes later. Captain Hartnett then arrived. He testified:

"Well, after he [Culpepper] introduced the defendant, Lieutenant Culpepper, in his [the defendant's] presence, then told me that he had talked to the defendant and that he told him that he was the one who had been in the apartment on Massachusetts Avenue and had the trouble with the woman.

\*   \*   \*   \*   \*   \*

"Q. What else was said or done at that time by anyone?

2. After appellant had made admissions to Lieutenant Culpepper and, as will appear *infra*, to Captain Hartnett, the police did not immediately present appellant before a committing magistrate but took him to the scene of the alleged crime to re-enact it. On the former appeal we held the re-enactment evidence barred by *Mallory*. At the second trial, no testimony was offered concerning the re-enactment.

"A. Well, after Lieutenant Culpepper had run through in substance, what the defendant had told him, I told him I had a couple of questions I wanted to ask him.

"Q. Now, what exactly, did the Lieutenant run through, if you can recall?

"A. Well, the substance of it was—

"MR. NORDLINGER [Defense Counsel]: This, of course, is over our objections for the reasons discussed at the bench, Your Honor.

"THE COURT: All right. Denied.

"THE WITNESS: That the defendant had told him that he lived in the next apartment to 225, he lived next door; that he had gone into 225 Massachusetts Avenue to look around, that he noticed the apartment door was slightly open, he went into this apartment, he looked around and started going through things. While he was in there the woman came in on him and that he struck her several times, and, well, that's about the gist of it.

"BY MR. SMITHSON:

"Q. He said *he struck her* several times?

"A. *He struck her* a couple of times." [Emphasis supplied.]

Captain Hartnett's testimony differed from Lieutenant Culpepper's in one crucial respect. Culpepper testified that appellant said he had no memory of hurting the woman. Hartnett testified that Culpepper told him, in appellant's presence, that appellant had said he "struck her several times" or "a couple of times." Since appellant's defense of insanity rested largely on his claim that, because of an epileptic seizure when the woman entered the room, he remembered nothing, the prosecution relied heavily on Hartnett's testimony to show that appellant did remember.

■ Defense counsel objected to the admission of Hartnett's testimony on *Mallory* grounds. He urged that the Hartnett interview took place after the initial statement to Culpepper and during a period of unreasonable delay. In overruling this objection, the trial court said the admissions to Culpepper and to Hartnett were "one continuous confession or admission." We need not rule on this point, because we think this testimony by Hartnett is hearsay and appellant's assent to the statement that "he struck her" was not clear enough to allow Hartnett's testimony under the adoptive admission exception to the hearsay rule.

Hartnett did not testify that appellant said to him that appellant struck the woman. Hartnett testified that *Culpepper recounted to Hartnett*, in appellant's presence, that appellant had admitted to Culpepper that he struck the woman. This was double hearsay. Before the jury, Hartnett did not testify that appellant affirmatively agreed to the statement that he struck the woman. But the jury may have inferred that appellant remained silent and may have thought that appellant thereby agreed to Culpepper's statement, as reported by Hartnett, that appellant said he struck the woman. Earlier at a hearing not in the presence of the jury, on the question of this testimony's admissibility, Hartnett had testified that, after Culpepper had completed his resume of appellant's admissions, "I turned to the defendant and I said, 'Is what * * * the Lieutenant said right?' He nodded his head 'Yes.'"

■ "Multiple hearsay is, of course, even more vulnerable to all the objections which attach to simple hearsay, and it seems that if it is to come in at all, each of the out-of-court statements must satisfy the requirements of some exception to the hearsay rule." McCORMICK, EVIDENCE § 225, at 461 (1954). The only exception which could be considered here is the one regarding adoptive admissions. Testimony that an accused adopted statements of another person as his own admissions may be let in under this exception if it clearly appears that the accused understood and unambiguously assented to those statements. Skiskowski v. United States, 81 U.S.App.D.C. 274, 158

F.2d 177 (1946), cert. den. sub nom., Quinn v. United States, 330 U.S. 822, 67 S.Ct. 769, 91 L.Ed. 1273 (1947).[3] " * * * [T]he question of fact whether the party's conduct manifested his assent to the statement of the other person is a preliminary question for the judge. Unless he so finds, the statement is excluded."[4] In the present case, the trial court was not requested to consider this question and it did not.

■ It also appears that if testimony is allowed as an oral adoptive admission, the jury should be cautioned "against trusting overmuch to the accuracy of such testimony," since there are "great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard. * * *" 7 WIGMORE, EVIDENCE § 2094, at 468 (3d ed. 1940).[5] But no such instruction was sought or given here.

We think the record does not permit a fair inference that appellant agreed to the statement that he had "struck the woman." Appellant, described by a Government witness as having a "low average" intelligence quotient, had been arrested and taken to a police station, interviewed by one officer in a private room, taken downstairs to be booked by another officer, and returned upstairs to be confronted by yet another officer. Appellant then allegedly heard Culpepper tell Hartnett that appellant admitted the following: that he lived next door to 225 Massachusetts Avenue, that he had gone into 225 Massachusetts Avenue to look around, that he noticed the apartment door was slightly open, that he went into this apartment, that he looked around and started going through things, that while he was there the woman came and that he struck her several times. Appellant allegedly responded to this lengthy statement either by remaining silent or by nodding his head "Yes." Either response gives little assurance that appellant adopted, as his own admission, every detail of the statement or, more particularly, that he adopted the statement that "he struck her."

Moreover, Culpepper flatly contradicted Hartnett's testimony. Culpepper testified that appellant himself repeated his admissions in full to Hartnett, and that

---

3. In *Skiskowski*, this court stated that although evidence of a confession may be admissible where " * * * the defendant, when confronted with damaging accusations in a situation calling for a response, remained silent, or affirmatively indicated agreement with the charges. * * * [nevertheless] [t]he cases repeatedly emphasize the need for careful control of this otherwise hearsay testimony, and we do not think it wise to extend the 'exception' to embrace any and all of the defendant's reactions." 81 U.S.App.D.C. at 278–279, 158 F.2d at 181. In that case an F.B.I. agent confronted the defendant with a statement by an alleged accomplice implicating the defendant in an offense. The agent testified that while this damaging statement was being repeated to the defendant, the defendant nodded his head "up and down," though at the end of the statement he denied complicity. This court ruled that, as a matter of law, the defendant's concurrence in the damaging statement was too ambiguous, too lacking in evidentiary weight, to be properly submitted to the jury. See also Kelley v. United States, 99 U.S.App.D.C. 13, 236

F.2d 746 (1956); United States v. Gross, 276 F.2d 816 (2d Cir.), cert. denied, 366 U.S. 935, 81 S.Ct. 1659, 6 L.Ed.2d 847 (1960); Arpan v. United States, 260 F. 2d 649 (8th Cir. 1958).

4. McCORMICK, EVIDENCE § 246, at 527 (1954); MODEL CODE of EVIDENCE, Rule 507 and commentary. Compare State v. Davis, 61 N.J.Super. 536, 161 A.2d 552 (1960) (There must be "understanding of the incriminating meaning" of the attributed admission, 161 A.2d at 558); State v. Sweeny, 77 N.J.Super. 512, 187 A.2d 39 (1962); Commonwealth v. Sazama, 339 Mass. 154, 158 N.E.2d 313 (1959); Commonwealth v. Burke, 339 Mass. 521, 159 N.E.2d 856, 77 A.L.R.2d 451 (1959); People v. Briggs, 58 Cal.2d 385, 24 Cal. Rptr. 417, 374 P.2d 257 (1962).

5. See Dickerson v. United States, 62 App. D.C. 191, 193–194, 65 F.2d 824, 826–827 (1933); Sandez v. United States, 239 F. 2d 239, 250 (9th Cir. 1956); State v. Bemis, 33 Cal.2d 395, 202 P.2d 82 (1949) (Traynor, J.); Note: *Silence as Incrimination in Federal Courts*, 40 MINN. L.REV. 598, 605 (1956).

appellant consistently maintained that he had no memory of the stabbing. Since Hartnett testified that Culpepper had said appellant admitted striking the woman, Culpepper's denial that appellant made such a statement casts great doubt on whether appellant agreed to the statement "he struck her." The contradiction between the Government witnesses hardly provides clear evidence of assent.

■ We therefore hold that Hartnett's testimony, under discussion here, is inadmissible as a matter of law. We make this determination, rather than remand for the trial court's consideration, because we are "of clear opinion" [6] that under no reasonable view of the record can it be said that appellant unambiguously and comprehendingly assented to the statements which Hartnett attributed to him.

■ The error we discuss was not raised below or in this court. Nevertheless, we think reversal is authorized by the "plain error" rule, Rule 52(b), FED.R.CRIM.P., since the prosecution urged the erroneously admitted testimony to discredit an essential aspect of appellant's insanity defense which was his primary if not only defense.[7]

## II.

Appellant contends that the housebreaking and felony murder charges should be dismissed because there was insufficient corroboration of his admission to Lieutenant Culpepper that he entered the deceased's apartment building "looking for something to steal," and because this intent to steal at the time of entry is an essential element of both offenses.

■■ A confession must be corroborated by extrinsic evidence. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L. Ed. 192 (1954). Some courts have required that every essential element of the confession be corroborated [8] while other courts have required merely that enough of the confession be corroborated to establish its general trustworthiness.[9] The Supreme Court has established only (1) that the prosecution must present some extrinsic evidence to corroborate a confession, and (2) that the corroborative evidence need not be sufficient, exclusive of the confession, to establish guilt beyond a reasonable doubt. Opper v. United States, supra; Smith v. United States, supra. But beyond these two broad propositions, " * * * it is not clear what quantum of corroboration is required or to what matters the corroboration must relate." Fisher v. United States, 324 F.2d 775, 778 (8th Cir. 1963).

Minimal corroboration of confessions may be sufficient to avoid the dangers of conviction based on false confessions induced by some inner compulsion.[10] But it may not always be sufficient to pre-

---

6. Quinn v. United States, 91 U.S.App.D. C. 344, 348, 203 F.2d 20, 24 (1952), rev'd on other grounds, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955). Cf. McNabb v. United States, 318 U.S. 332, 338 n. 5, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

7. See Stewart v. United States, 101 U.S. App.D.C. 51, 56, 247 F.2d 42, 47 (1957) (en banc); Mullen v. United States, 105 U.S.App.D.C. 25, 263 F.2d 375 (1958); Pinkard v. United States, 99 U.S.App. D.C. 394, 240 F.2d 632 (1957); Barry v. United States, 109 U.S.App.D.C. 301, 287 F.2d 340 (1961).

8. Cash v. United States, 104 U.S.App.D.C. 265, 272, 261 F.2d 731, 738 (1958), rev'd on other grounds, 357 U.S. 219, 78 S.Ct. 1365, 2 L.Ed.2d 1361 (1958); Fisher v. United States, 324 F.2d 775, 780 (8th Cir. 1963); Yarbrough v. United States, 309 F.2d 936 (10th Cir. 1962); Sells v. United States, 262 F.2d 815 (10th Cir. 1959); French v. United States, 232 F.2d 736, 741 (5th Cir. 1956) (concurring opinion).

9. Scarbeck v. United States, 115 U.S.App. D.C. 135, 155, 317 F.2d 546, 566 (1963), cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963); Caster v. United States, 319 F.2d 850 (5th Cir. 1963); French v. United States, 232 F.2d 736 (5th Cir. 1956); United States v. Baker, 293 F.2d 613 (3d Cir. 1961).

10. See 7 WIGMORE, EVIDENCE § 2070, at 395; Miller v. United States, 116 U.S. App.D.C. 45, 320 F.2d 767 (1963).

serve the integrity of our system of criminal justice. As the Supreme Court has recently reemphasized, "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." Escobedo v. United States, 378 U.S. 478, 488–489, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964). Thus, sufficient extrinsic evidence should be required to preserve the integrity of the right against self-incrimination, the presumption that every accused is innocent until his guilt is established beyond a reasonable doubt and the accusatorial nature of our system.

We think the extrinsic evidence of appellant's intent to steal when he entered the premises is sufficient. First, the evidence regarding the position of the body near the door, the knife wounds, the charred gloves on the apartment stove, all directly corroborate important details of appellant's admissions. Next, extrinsic evidence regarding drawers and closets pulled open and apparently searched, and an empty wallet found by police in full view on the sofa, indirectly or inferentially corroborate appellant's admissions that he attempted to steal something in the apartment. Third, the circumstances of appellant's initial entry into the apartment are corroborated. Appellant admitted that when he approached the apartment, the door was ajar and the apartment was unoccupied; there was testimony that the deceased had left her apartment to return a borrowed key to the resident manager's apartment on the next floor, and it is a fair inference that deceased left the door to her apartment ajar for this short errand. This evidence corroborates appellant's admissions regarding the stabbing, his attempting to steal after he entered, and his entry when the apartment was empty and the door ajar. We think it is also sufficient to support a jury inference of intent to steal upon entry. It might not be sufficient to corroborate appellant's admission that he actually found money in the apartment.[11] But a subjective fact like intent to steal cannot be proved by direct evidence as objective facts such as possession of stolen property can.[12] Corroboration of intent must necessarily rest largely on inference.

### III.

■ Appellant contends the trial court should have directed a verdict of not guilty by reason of insanity. He advances two arguments. The first is that the Government introduced insufficient evidence to counter appellant's insanity defense. This insanity defense was persuasive. Appellant's mother, his teacher (Mrs. Leaf), and others testified to recurring "blackouts." A physician from District of Columbia General Hospital testified that appellant had an epileptic seizure during an electroencephalogram test. Appellant's history indicated that he spoke nothing but gibberish until he was eight years old; he was placed in special classes for disturbed and retarded children throughout his public schooling; and his intelligence quotient registered in various tests from 65 to 69. Testimony by expert and lay witnesses showed appellant's emotional instability and impulsiveness; he had been discharged from the armed services for mental deficiency; he had threatened his sergeant with a rifle, and at times he apparently had the delusion that he had killed the sergeant. But, on the other hand, experts for the Government testified that there was no record of any epileptic seizure during appellant's two-year con-

---

11. We note that the trial court dismissed the petty larceny indictment for lack of corroboration of appellant's admission that he took money.

12. See Forte v. United States, 68 App. D.C. 111, 118–119, 94 F.2d 236, 243–244, 127 A.L.R. 1120 (1937); Manning v. United States, 215 F.2d 945 (10th Cir. 1954). Compare Smith v. United States, 348 U.S. 147, 153–1154, 75 S.Ct. 194 (1954); Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 Pa.L.Rev. 638, 654, 661–663 (1955).

finement at St. Elizabeths Hospital, and they portrayed appellant as a disturbed personality but not so severely disturbed as to be classified "mentally ill." Hence this is not a case where all of the substantial testimony supports nothing but the thesis of insanity.[13] There was sufficient conflict to submit the question of sanity to the jury.

■ The Government psychiatrists testified that, although they thought appellant sane, other competent experts could think him insane. But it does not follow, as appellant contends, that the jury must necessarily have had a reasonable doubt on the issue. A psychiatrist's opinion "lies in estimate only and is the result of a balancing of concrete data." 7 WIGMORE § 1976, at 121. The jury is free to believe any reasonable "estimate" even though different or contrary views may also be reasonable. Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc).

### IV.

A lay witness, Mrs. Leaf, testified that she had been a teacher of "exceptionally disturbed children" for fifteen years in the public school system where she taught appellant from September 1951 until June 1952. On direct examination, after testifying about appellant's conduct she had observed, Mrs. Leaf was asked: "Do you have any recollection, either independently or from the records, of the mental condition of the defendant, John Naples, at that time?" The prosecutor objected to this question and the trial judge sustained the objection because "Mrs. Leaf * * * [was] a school teacher and not a psychiatrist, not a psychologist." Mr. Warner, custodian of the junior high school appellant attend-ed, after relating several incidents involving appellant, stated "that his [the accused's] sanity wasn't altogether clear." The prosecutor had objected to previous questions to Mr. Warner regarding appellant's mental state, and when Mr. Warner made this statement, the trial court immediately admonished the jury: "You will disregard that. This Custodian is not qualified as a psychiatrist or psychologist. That is a very technical subject and it is also something the jury will have to consider from their own background."

■ It was error to exclude the opinions of Mrs. Leaf and Mr. Warner. Lay witnesses may testify upon observed symptoms of mental disease, because mental illness is characterized by departures from normal conduct. Normal conduct and abnormal conduct are matters of common knowledge, and so lay persons may conclude from observation that certain observed conduct is abnormal. Such witnesses may testify only upon the basis of facts known to them. *They may testify as to their own observations and may then express an opinion based upon those observations.* Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training. Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused. [Carter v. United States, 102 U.S.App.D.C. at 237, 252 F.2d at 618, emphasis supplied.] [14]

13. Compare Isaac v. United States, 109 U. S.App.D.C. 34, 284 F.2d 168 (1960); Satterwhite v. United States, 105 U.S. App.D.C. 398, 267 F.2d 675 (1959); Wright v. United States, 102 U.S.App. D.C. 36, 250 F.2d 4 (1957); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); Douglas v. United States, 99 U.S.App.D.C. 232, 239 F. 2d 52 (1956).

14. See Wright v. United States, *supra;* Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U.S. 612, 619–622, 4 S.Ct. 533,

■ The court erred also in excluding evidence of a judicial determination that appellant was not competent to stand trial.[15] In Lyles v. United States the majority of this court held that if the defense introduced a judicial finding of incompetency to stand trial, the prosecution could then introduce a later judicial finding of competency to stand trial. Both the majority and the dissenting judges assumed that the judicial determination of incompetency was admissible. The dissenting opinion stated, " * * * incompetency to stand trial, though not *the same as* insanity, is *relevant* to it * * *." 103 U.S.App.D.C. at 39, 254 F.2d at 742.

■ A problem regarding the trial court's instructions to the jury on the insanity defense also deserves mention since it might arise in any new trial. Although the court in some parts of its charge correctly instructed the jury that the burden of showing freedom from mental illness rested on the prosecution, other parts of the charge implied the contrary. The court said:

"The problem for you is whether the accused was *suffering from a mental disease or defect * * * and if you find that he was,* whether there was a relationship between such disease or defect and the specific alleged criminal acts *and if so,* whether that relationship was such as to justify a reasonable inference that the accused would not have committed the acts if he had not had the disease or defect." [Emphasis supplied.]

Here and elsewhere in his charge, the judge intimated that in order to acquit on the ground of insanity the jury must affirmatively find a mental disease or defect and a causal relationship with the criminal act. Compare Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608 (1957); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957). Though it is difficult, it is also necessary, to cast instructions continually in terms of the Government's burden to show sanity beyond reasonable doubt. The obligation rests on counsel as well as the court to see that the jury is not confused in this matter.

"In order to convict, the jury must be convinced beyond a reasonable doubt either (1) that the accused had no mental disease or defect or (2) that, although the accused was defective or diseased, his act was not the product of the affliction. Or, to state the matter otherwise, the jury must acquit unless it is convinced beyond a reasonable doubt that the alleged criminal act was not the product of a mental disease or defect. [Carter v. United States, 102 U.S.App.D.C. at 234, 252 F.2d at 615.]"

## V.

■ We think the court erred in refusing to instruct the jury that it could not find appellant guilty of both first degree and second degree murder. Since the jury found appellant guilty on both counts, the error must be deemed prejudicial.

■ Sections 22–2401–02, District of Columbia Code (1961), define first degree murder.[16] Section 22–2403 provides: "Whoever with malice afore-

28 L.Ed. 536 (1884); Queenan v. Territory of Oklahoma, 109 U.S. 548, 549, 23 S.Ct. 762, 47 L.Ed. 1175 (1902); DeBruin v. DeBruin, 90 U.S.App.D.C. 236, 195 F.2d 763 (1952); Travelers Ins. Co. v. Childs, 272 F.2d 855 (2d Cir. 1959); 2 WIGMORE § 568, at 664–665; 3 *id.* § 689; 7 *id.* §§ 1933–1938.

15. Blunt v. United States, 100 U.S.App. D.C. 266, 244 F.2d 355 (1957); Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957) (*en banc*), cert. denied,

356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); 5 WIGMORE § 1671(5).

16. Section 22–2401 provides: "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, * * * rape, may-

thought, *except as provided in sections 22–2401, 22–2402*, kills another, is guilty of murder in the second degree."[17] (Emphasis supplied.) This makes it clear that a single offense cannot be both first and second degree murder. In Goodall v. United States, we said an instruction on both first and second degree murder.

> "is necessary only when from the evidence as a whole the jury might reasonably find the defendant guilty of *either* first or second degree murder, and *therefore must decide which degree had been committed*." [86 U. S.App.D.C. 148, 151, 180 F.2d 397, 400, 17 A.L.R.2d 1070 (1950), cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950), emphasis supplied.]

"At common law there were no degrees of murder. All homicide with malice aforethought, whether express or implied, was murder. And all murder was punished by death." Clark & Marshall, Crimes § 10.09 at 608 (6th ed. 1958). By statute murder was defined in various degrees in order to treat criminal behavior on a more individual basis. "First degree murder" now stands as the criminal act deserving the most severe sanction. To permit conviction of both first and second degree murder for the same offense would be contrary to the intent of the nineteenth century legal reforms which displaced undifferentiated common law murder.

If it is improper to sentence appellant for both first and second degree murder, as our dissenting brother apparently concedes, it seems to us also improper to instruct the jury that they can find guilt on both counts. Our brother says an instruction which requires a choice would confuse the jury. The jury may also be confused by instructions about "premeditation" or "malice" as elements distinguishing one degree of murder from another; but this would hardly justify a refusal to instruct the jury that it could not convict for both greater and lesser degrees of a single offense.[18]

### VI.

In the prosecutor's closing argument, he said to the jury: "Whether there was or was not [blood] on any clothing that was worn by defendant at that time, you don't know, and I don't know. One man knows. He sits there." Defense counsel moved for a mistrial on the ground that this called attention to appellant's failure to testify. The trial court denied the motion but gave an immediate corrective instruction to the jury. We need not decide whether a mistrial should have been granted since we order a new trial on other grounds.

Appellant contends that because the jury unanimously recommended life imprisonment, he may not be sentenced to death if at a new trial he is again found guilty of first degree murder. This contention involves constitutional ques-

---

hem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree." Section 22–2402 deals with first degree murder in maliciously obstructing railroads or street railroads.

17. Compare 18 U.S.C. § 1111 (1958): "(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlaw-

fully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. *Any other murder is murder in the second degree.*" (Emphasis supplied.)

This provision states more clearly the intent of the District of Columbia Code.

18. See Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Williams v. United States, 76 U.S.App.D.C. 299, 131 F.2d 21 (1942). Cases cited by our brother hold only that sentences may not be imposed for both lesser and greater degrees of a single offense. The question whether a jury may properly find guilt for several degrees of the same offense was not considered.

tions,[19] which we should consider only if it becomes necessary to do so.

Reversed and remanded for a new trial.

BASTIAN, Circuit Judge (dissenting):

I would affirm the convictions in this case, and state my views.

First, as to the testimony of Captain Harnett: I agree that adoptive admissions are admissible in evidence against a defendant. If, as the testimony outside the presence of the jury indicated, Naples said "Yes" to the question: "Is what * * * [Culpepper] said right?" then I have no doubt that the statement made by Culpepper was adopted by Naples and was admissible as part of Harnett's testimony. On the other hand, if Naples was silent at the end of Culpepper's recital, then the question turns on whether or not this silence was an effective adoption. Since the jury was not informed of the affirmative response testified to out of its hearing, I consider on this appeal only the response of silence.

Admittedly, silence in the face of an accusatory statement (in this case, a recital of Naples' own words) may be an adoption of that statement. Whether or not silence in a given case is an adoption is a question of fact. For myself, I am satisfied from the record that had this issue been raised at trial it would not have been error to resolve it in favor of admissibility. However, as the majority points out, there was no objection on this ground and the trial judge had no occasion to consider it. Nor was any instruction relating to adoptive admissions requested or given. Though the question was neither raised in the trial court nor argued on appeal, the majority of this court, on its own initiative, not only raises the question but, without opportunity on the part of the Government to argue the point, decides as a *matter of law* that Naples did not

assent to (and thereby adopt) Culpepper's recital. In so doing, the majority relies heavily on the difference between the testimony of Captain Harnett and that of Lieutenant Culpepper as to whether Naples or Culpepper repeated the admission. This is merely a case of one witness contradicting another and is a far cry from showing no assent. In fact, the contradiction demonstrates the reliability of the testimony; parrot-like testimony of two witnesses is always ground for suspicion. In any event, I reject the concept that this court can on this record decide the fact of assent as a matter of law. Underlying the application of Rule 52(b) is the majority's assumption that the trial judge, *sua sponte,* should have rejected Harnett's testimony as not coming within the adoptive admissions exception to the hearsay rule. Since this is obviously a question of fact, and since there was neither objection nor a request for instruction on this point in the trial court or here, it is not a case of "plain error affecting substantial rights."

Assuming, as the majority does and as it must, that Captain Harnett's testimony is correct, the "second confession" is not a confession at all and does not come within the *Mallory* rule.

Turning to the other points raised on this appeal and discussed by the majority, I agree that the element of intent to steal, as found in Naples' confession, was sufficiently corroborated by independent evidence. I further agree that the evidence of insanity *vel non* presented a question of fact for the jury. Although the issue raised concerning the prosecutor's comment to the jury is rendered moot by the decision of the majority to reverse, I do not think that that comment is sufficient ground for reversal. And, as this court does not give advisory opinions, I shall not express myself on the double jeopardy argument made by appellant.

19. Compare Green v. United States, 355 U. S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); Stroud v. United States, 251 U. S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); Trono v. United States, 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292 (1905).

As far as the majority's discussion of the insanity defense and the evidentiary points raised therein are concerned, I think I need only point out that although opinion testimony of lay witnesses who have observed a person claimed to be of unsound mind is not ordinarily excludable, adequate grounds for the exclusion did exist here. The trial judge has always had a measure of discretion in allowing cumulative evidence; and, in view of the voluminous expert testimony as to insanity, as well as the fact that lay witnesses were permitted to testify to everything but their conclusory opinions, I can find no prejudice to Naples arising out of this exclusion. I might add that, as I read the opinion in this case, the majority also finds no prejudice. It is worthy of note that the lay witnesses' testimony as given and as proffered, but excluded, is of doubtful probative value. These witnesses testified to their observations of Naples years before the crime, but the issue was his sanity at the time of its commission.

The exclusion of evidence of a judicial finding of appellant's incompetency to stand trial was not, in my opinion, error. It would seem that the majority has misplaced reliance on our *en banc* opinion in Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). True, we there held that after the defense had introduced a finding of incompetency it was proper for the prosecution to counter by introducing a subsequent finding of competency, but we did not rule that the finding of incompetency was properly admitted in the first place. As Judge Bazelon himself noted in his dissent, 103 U.S.App.D.C. at 39, 254 F.2d at 742: "My brethren of the majority now seem to assume that appellant had no right to introduce the * * * order [adjudicating incompetency]." Since the issues of incompetency to stand trial and of insanity at the time of the commission of the crime deal with problems which are not only unrelated in time, but which also require a different quality of proof, the former is irrelevant to the latter. Cf. Blunt v. United States, 100 U.S.App.D.C. 266, 278, 244 F.2d 355, 367 (1957), dictum which, assuming the identity of the mental condition in issue, deals only with time as a factor of relevance.

Lastly, I seriously dispute the position of the majority that the statutory definitions of first and second degree murder are mutually exclusive and that the same homicide cannot consistently result in a verdict of guilty of more than one degree of murder. D.C.Code § 22–2401 sets out four ways in which first degree murder may be committed:

"Whoever, being of sound memory and discretion, kills another purposely, either [1] of deliberate and premeditated malice or [2] by means of poison, or [3] in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or [4] without purpose so to do kills another in perpetrating or in attempting to perpetrate * * any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree." [Subheads added.]

Since the indictment in this case charged first degree murder by means of method [4], *i. e.*, felony-murder, the failure of the trial judge to charge the jury that they could find the defendant guilty on only one of the two murder counts would be error only if this portion of the statute is inconsistent with second degree murder. Section 22–2403 says that second degree murder is committed by one who "with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another." I fail to see why the exception clause in section 22–2403 "makes it clear that a single offense cannot be both first and second degree murder," as the majority holds. One homicide can result in the imposition of only one sentence therefor but we are not dealing with multiple sentences. We are dealing with degrees of the same crime. Murder is murder but, depending on the circumstances of the crime and the theory of the Government's case, the

same crime can consistently meet all the criteria of both degrees of murder, or be first degree murder under more than one of the theories and sets of proof which would be acceptable under the methods described in section 22–2401.

At the beginning of any analysis of first and second degree murder statutes, one is confronted with the various problems summed up in the doctrine of "lesser included offense." On the one hand, we have held that second degree murder is a lesser offense *necessarily* included in a charge of first degree murder. Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (1962); Hansborough v. United States, 113 U.S.A-p.D.C. 392, 308 F.2d 645 (1962); Kitchen v. United States, 92 U.S.App.D.C. 382, 205 F.2d 720 (1953); Goodall v. United States, 86 U.S.App.D.C. 148, 180 F.2d 397, 17 A.L.R.2d 1070, cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950). On the other hand, we have held it to be erroneous for a trial judge to give a second degree murder lesser included offense instruction unless the evidence adduced at trial supports such an instruction. Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961), cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L. Ed.2d 613 (1962); Green v. United States, 95 U.S.App.D.C. 45, 218 F.2d 856 (1955); compare Tansimore v. United States, 115 U.S.App.D.C. 199, 317 F.2d 899 (1962), cert. denied, 374 U.S. 839, 83 S.Ct. 1892, 10 L.Ed.2d 1060 (1963). In fact, in *Hansborough* Judge Wright, writing for a unanimous court, said:

> "If the evidence precludes the legal possibility of guilt of a lesser included offense, then it would be error to submit the case to the jury on such offense. For example, in a felony murder case where the statute requires a verdict of murder in the

first degree irrespective of premeditation, in the absence of special circumstances, instruction on lesser included offenses would be wrong." 113 U.S.App.D.C. at 395; 308 F.2d at 648.

If evidence specifically pointing to second degree murder is required for such an instruction, it must be that such evidence is, or may be, different from evidence required to support the first degree murder charge. Otherwise (*i. e.*, if the evidence is always the same), a second degree murder instruction would in all cases be proper. I believe that this seeming conflict is the unfortunate result of imprecise language in some of the decisions. Second degree murder is not a necessarily included lesser offense. Under our statutes it *may* be a lesser included offense, but it is not *necessarily* so.

As set out above, section 22–2401 defines four types of (or methods of committing) first degree murder. Only method [1] requires a showing of actual malice. In methods [2], [3] and [4], the malice required is implied by law,[1] and the prosecution need neither plead nor prove malice. There is, however, only one kind of second degree murder, and that is a killing done with malice aforethought. Accordingly, to make out a case of second degree murder, the prosecution must plead and prove actual malice.[2] This is an element of proof not required for first degree murder by methods [2], [3] and [4]; and, to make out a case of first degree murder by method [1], the proof of malice aforethought which would be sufficient under section 22–2403 must be raised by additional proof to that higher order of malice denominated in section 22–2401 as "deliberate and premeditated malice." Thus, as to first degree murder by meth-

---

1. Wheeler v. United States, 82 U.S.App. D.C. 363, 165 F.2d 225 (1947), cert. denied, 333 U.S. 829, 68 S.Ct. 448, 92 L. Ed. 1115 (1948); Goodall v. United States, 86 U.S.App.D.C. 148, 180 F.2d 397, cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950).

2. Though malice aforethought may be inferred from circumstances such as the brutality of the killing, Evans v. United States, 122 F.2d 461 (10th Cir. 1941), cert. denied 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558 (1942), this is still actual malice.

od [1], it may properly be said that second degree murder is a *necessarily* included lesser offense; but, as to first degree murder by methods [2], [3] and [4], second degree murder may or may not be a lesser included offense, depending upon the theory of the case as supported by the circumstances of the homicide and the evidence adduced at trial. If only first degree murder by method [4] (felony murder) is charged, there is no second degree aspect unless and until evidence tending to show malice aforethought is introduced. Then and only then may the defendant, if he wishes, request and be entitled to receive a lesser included offense instruction on second degree murder. The only difference between this example and the instant case is that here both first and second degree murder were charged in separate counts, thereby requiring the Government to prove not only that the homicide occurred during the perpetration or attempted perpetration of the felony (in order to sustain the first degree murder count), but also to prove malice aforethought (in order to sustain the second degree murder count).

The fallacy in the position taken by the majority is simply failure to recognize that a single act may give rise to alternate theories upon which the Government may proceed and be successful if the jury believes all the proof. The fact that a homicide may involve all the elements of second degree murder would not prevent that homicide from also involving all the elements of all or any one of the four sets of criteria by which first degree murder may exist under section 22–2401. There is no contradiction here, and there can be none, because a verdict of guilty of first degree murder does not negate the existence of any fact needed to make out complete proof of second degree murder for the same crime.[3] I cannot accept the argument that Congress intended, by the wording of the statutes, that the Government must make a choice of possible theories and be bound by that choice, especially in a case such as this, where it is virtually undisputed that a crime has been committed.

Furthermore, the very terms of the statutes here involved belie the interpretation placed on them by the majority. As noted, section 22–2403 defines as second degree murder a malicious homicide which need be neither premeditated nor deliberate.[4] On the other hand, section 22–2401 defines four types of first degree murder, only one of which (method [1]) requires a showing of actual malice. If section 22–2403 is to be construed as making first and second degree murder mutually exclusive, then on the face of the statute it would not be a mutual exclusion as to first degree murder by methods [2], [3] or [4] (felony murder, which is involved in this case). Rather, it would be an exclusion only as to method [1], premeditated murder; but even this construction would result in confusion, a result which I cannot concede to be Congress' intent. I believe that the "exception" clause in section 22–2403 is merely a referral to sections 22–2401 and 2402 designed to indicate that different and/or additional elements in a given homicide may raise the degree of the crime from second to first degree murder, and this raising of the degree does not wipe out the lower degree, if it can also be proved.

I believe that the foregoing is a correct statement of the law and conclusively demonstrates that the result reached by

3. The converse situation is not necessarily the same, as exemplified by the Supreme Court's holding in Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), that a verdict of guilty to second degree murder, standing alone, impliedly acquits the defendant of first degree murder, thereby raising a double jeopardy bar to retrial on the first degree charge. The Green case deals with a matter altogether different from the situation presented by Naples' instant appeal, and is inapposite on the facts.

4. Hansborough v. United States, 113 U.S. App.D.C. 392, 308 F.2d 645 (1962); Kitchen v. United States, 92 U.S.App.D. C. 382, 205 F.2d 720 (1953); Weakley v. United States, 91 U.S.App.D.C. 8, 198 F.2d 940 (1952).

the majority is erroneous. However, since the basic premise of my position is that second degree murder is not a lesser offense necessarily included in a charge of first degree murder (except as to method [1], murder with premeditated malice), I consider it now necessary to analyze the majority's view, starting with the premise that second degree murder is a lesser offense necessarily included in all cases of first degree murder. If this premise, which I believe to be wrong, is accepted as a starting point for analysis and argument, then when a case of first degree murder is proved against an accused, all elements of second degree murder would be necessarily proved at the same time as part of the proof of first degree murder. A verdict of guilty of first degree murder would necessarily include, by implication at least, a verdict of guilty of murder in the second degree, and this result cannot properly be said to be inconsistent merely because it is expressed in a verdict of guilty of each of two counts charging first and second degree murder respectively. To the contrary, the inconsistency is under the holding of the majority for, as I understand its view, if a jury wants to return a verdict of guilty to the first degree murder count, it is required, under the instructions insisted upon by my colleagues to return a not guilty verdict on the second degree murder count. Yet the latter is, under the premise here accepted for purposes of analysis, a necessarily included lesser offense which, *a fortiori*, must be proved in its entirety as part of the greater crime. Is the jury to be told this and then told that, even if they believe beyond a reasonable doubt that all elements required under the first degree murder count have been proved, they must return a verdict of not guilty to second degree murder, thereby affirmatively stating that those elements of first and second degree murder which overlap and duplicate do not exist as fact? Merely stating the proposition demonstrates the illogic and confusion inherent in the majority view. Unless and until an inconsistency in the counts and the resultant verdicts can be shown, there is no prejudice, real or presumed, to an accused; in fact, absent the inconsistency, instructing the jury that the degrees of murder are mutually exclusive will only result in confusion and prejudice to the Government and the public, whose rights are also involved in every criminal trial, a matter sometimes overlooked.[5]

---

5. My colleagues cite Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), and Williams v. United States, 76 U.S.App.D.C. 299, 131 F.2d 21 (1942), to the effect that jury confusion is no justification for avoiding complete instructions. These cases clearly affirm, and I do not dispute, the necessity for jury instructions covering all essential elements of the offense charged, including differences between similar crimes, but this is not the point. The point is that, in essence, the statutory scheme as outlined in the D.C.Code in Sections 22–2401 through 22–2404 "does not create two separate crimes but prescribes alternative sentences for the same crime depending upon the manner of its perpetration." The quoted language is taken from Holiday v. Johnston, 313 U.S. 342, 349, 61 S.Ct. 1015, 1017, 85 L.Ed. 1392 (1941), and the same litigation later on in the Eighth Circuit, Holiday v. United States, 130 F.2d 988, 989 (1942). These cases deal with robbery under 18 U.S.C. § 2113, formerly 12 U.S.C. § 588, but the principle and reasoning is perfectly analogous to murder under the D.C.Code. In these cases, Holiday was charged with two counts of bank robbery, one count specifying a more aggravated means of perpetration. Holiday pleaded guilty to the indictment and was sentenced to ten years on count one and fifteen years on count two, the sentences to run consecutively. The courts held that for sentencing purposes there was but one offense charged and while vacating the ten year sentence the courts allowed the longer fifteen year sentence to stand.

The underlying assumption of the *Holiday* cases is that it was proper for him to plead guilty to the indictment or to both counts thereof, but that as only one offense was charged (but was charged in two different ways), only one sentence was permissible. I can see no difference in allowing guilty verdicts on various murder counts which charge different means of perpetration as long as only one sentence is given. Other cases which support this view include: Sawyer v.

As I said, regardless of how many theories of murder are proved, only one sentence may be imposed for any one killing, but that sentence may be the maximum prescribed by law for the highest degree of murder proved and on which the verdict of guilty is returned.

I think appellant had a fair trial; his guilt was conclusively demonstrated; and the jury's verdict was more than fair to the appellant in that the jury could have recommended the death penalty.

I see no ground for reversal.

United States, 312 F.2d 24 (8th Cir. 1963); United States v. Trumblay, 286 F.2d 918 (7th Cir. 1961); Duboice v. United States, 195 F.2d 371 (8th Cir. 1952); Gebhart v. Hunter, 184 F.2d 644 (10th Cir. 1950); Barkdoll v. United States, 147 F.2d 617 (9th Cir. 1945).

Neither consecutive nor concurrent sentences in the situation here involved constitutes reversible error. Erroneous con-

secutive sentences are correctible as in the *Holiday* cases. Erroneous concurrent sentences are likewise correctible, but are not reversible error affecting the conviction. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); Lewis v. United States, 105 U.S. App.D.C. 15, 263 F.2d 265 (1958), cert. denied 359 U.S. 959, 79 S.Ct. 798, 3 L.Ed. 2d 766 (1959).